UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BULLDOG INVESTORS LLP, SPECIAL OPPORTUNITIES FUND, INC., and HIGH INCOME SECURITIES FUND,<br><br>Plaintiff,<br><br>v.<br><br>FIRST TRUST ADVISORS L.P., JAMES A. BOWEN, RICHARD E. ERICKSON, THOMAS R. KADLEC, DENISE M. KEEFE, ROBERT F. KEITH, and NIEL B. NIELSON,<br><br>Defendants. | Civil Action No. _____ |

## **COMPLAINT**

Plaintiffs Bulldog Investors LLP ("Bulldog"), Special Opportunities Funds, Inc. ("SPE"), and High Income Securities Fund ("PCF" and, together with Bulldog and SPE, the "Plaintiffs") allege, upon personal knowledge as to themselves and their own actions, and upon information and belief as to all other matters, the following for their complaint against First Trust Advisors L.P. ("First Trust") and James A. Bowen, Richard E. Erickson, Thomas R. Kadlec, Denise M. Keefe, Robert F. Keith and Niel B. Nielson, in their capacities as members of the Board of Trustees (the "Board") of First Trust Dynamic Europe Equity Income Fund ("FDEU" or the "Fund") (the "Trustee Defendants" and, together with First Trust, the "Defendants).

## INTRODUCTION

"*I don't care who does the electing, as long as I get to do the nominating.*"

- William "Boss" Tweed

1.      In this case, the incumbent fiduciaries have held their positions so long, and become so comfortable with their power and income, that they have forgotten the source from which their power derives and whose financial interests they are duty bound to protect.

2.      FDEU is a closed-end fund managed by First Trust and overseen by the Trustee Defendants, who oversee all of First Trust's investment funds. FDEU was created in 2015 and has performed poorly since. By late 2022, its total returns trailed inflation, its net asset value ("NAV") declined by more than 30%, and the discount between the market price of the Fund's shares and their intrinsic value grew to more than 10%.

3.      Plaintiffs hold nearly 6% of FDEU's voting shares and are concerned by the Fund's underperformance. In 2022, Plaintiffs attempted to persuade First Trust and the Trustee Defendants to take action to improve the Fund, but talks fell through on December 1, 2022, just two days before the deadline to make trustee nominations for the Fund's 2023 annual meeting.

4.      Despite the narrow window, Plaintiffs promptly provided notice of their nomination of two new trustees for election by the shareholders (the "Nominees," as defined below). Defendants, for their part, nominated two of the Board's incumbents for reelection.

5.      Rather than compete for votes in a contested election, First Trust and the Trustee Defendants rejected Plaintiffs' Nominees outright for unspecified reasons purportedly based on the Fund's intentionally labyrinthine Bylaws. Plaintiffs requested specificity as to the objections so that they could cure any perceived deficiency, but Defendants refused.

6.      Undeterred, on or about March 3, 2023, Plaintiffs began to solicit the Fund's shareholders for their proxies to vote in favor of the Nominees at the upcoming annual meeting, which was scheduled for April 3, 2023.

7.      Rather than campaign on the merits, First Trust and the Trustee Defendants adopted an obstructionist approach. They announced to shareholders that Plaintiff's Nominees had been "deemed ineligible" (still, with no explanation) and encouraged shareholders not to vote in favor of the Nominees because such votes would "not be counted."

8.      In addition, Defendants revealed their intent to utilize an illegal defensive measure (the "Control Share Bylaw," as defined below), which was unilaterally adopted by Defendants without shareholder approval and has been determined by Massachusetts and New York courts to violate the Investment Company Act of 1940 (the "ICA"). The mechanism is designed to intentionally exclude votes by large shareholders with so-called "control shares," and shareholders owning more than a certain percentage of the Fund's outstanding shares, as deemed by Defendants, would be precluded from exercising their full voting power.

9.      Notwithstanding these headwinds, Plaintiffs pressed on, campaigning on the platform of improving the Fund's condition, including with respect to its trading discount. First Trust chose not to meaningfully respond to Plaintiffs' arguments and simply told shareholders not to waste their time voting for Plaintiffs' nominees because any votes would be discarded.

10.      This lazy gambit was a strategic error. Shareholders resoundingly rejected the incumbents and submitted votes overwhelmingly in favor of the Nominees. Even excluding control share votes, Plaintiffs' Nominees collected enough votes to have won the election by a margin of 54% to 46%. Counting the control share votes, the Nominees would have trounced Defendants' nominees by a margin of 62% to 38%.

11.     However, because Defendants had stated in advance that they would refuse to count votes in favor of the Nominees, Plaintiffs boycotted the Fund's annual meeting and did not submit the votes in favor of the Nominees.

12.     As a result, Defendants failed to obtain a quorum (which requires one third of outstanding shares), and it appears that the meeting was adjourned without election of any trustees.

13.     Through this action, Plaintiffs seek a declaratory judgment that the Nominees were improperly rejected, that the Control Share Bylaw is unenforceable under the ICA, and that the Control Share Bylaw is rescinded. Plaintiffs also seek damages, fees, costs and expenses caused by Defendants' self-interested and disloyal conduct.

## PARTIES

### A.     Plaintiff

14.     Plaintiff Bulldog is an investment adviser registered with the SEC. It serves as the investment adviser to SPE.

15.     Plaintiff SPE is a Maryland corporation registered with the SEC as a closed-end investment company. SPE has held shares of FDEU at all relevant times discussed herein.

16.     Plaintiff PCF is a Massachusetts business trust registered with the SEC as a closed-end investment company. It is internally managed by its board of trustees, which include certain principals of Bulldog. PCF has held shares of FDEU at all relevant times discussed herein.

### B.     First Trust

17.     First Trust is an SEC-registered investment advisory firm organized as an Illinois limited partnership. First Trust manages FDEU's investment portfolio pursuant to an Investment Management Agreement under which First Trust is compensated monthly at an annualized rate of 1.10% of the Fund's managed assets.

C.     **The Trustee Defendants**

18.     The Trustee Defendants are responsible for managing the business and affairs of FDEU, a Massachusetts business trust.

19.     Defendant James A. Bowen has been a trustee since the Fund's inception in 2015. He is the CEO of First Trust and therefore is considered an interested trustee. Bowen also sits on the boards of all other First Trust funds and joined First Trust in 1999. He is paid by First Trust.

20.     Defendant Richard E. Erickson has been a trustee since the Fund's inception in 2015. He also sits on the boards of all other First Trust funds and joined the First Trust complex as a trustee in 1999. He was paid $524,750 in 2022 for his position as a trustee of the First Trust funds.

21.     Defendant Thomas R. Kadlec has been a trustee since the Fund's inception in 2015. He also sits on the boards of all other First Trust funds and joined the First Trust complex as a trustee in 2003. He was paid $524,280 in 2022 for his position as a trustee of the First Trust funds.

22.     Defendant Denise M. Keefe has been a trustee since 2021. She also sits on the boards of all other First Trust funds and joined the First Trust complex as a trustee in 2021. She was paid $504,158 in 2022 for her position as a trustee of the First Trust funds.

23.     Defendant Robert F. Keith has been a trustee since the Fund's inception in 2015. He also sits on the boards of all other First Trust funds and joined the First Trust complex as a trustee in 2006. He was paid $514,231 in 2022 for his position as a trustee of the First Trust funds.

24.     Defendant Niel B. Nielson has been a trustee since the Fund's inception in 2015. He also sits on the boards of all other First Trust funds and joined the First Trust complex as a trustee in 1999. He was paid $533,750 in 2022 for his position as a trustee of the First Trust funds.

## II.    JURISDICTION

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.

26.    This Court has personal jurisdiction as to each Defendant under Mass. Gen. Laws ch. 223A, § 3(a), (b), (c) and (d) because each is a manager and/or fiduciary of FDEU, a Massachusetts business trust, provides services to FDEU in Massachusetts, has caused injury in Massachusetts by their conduct within and outside of Massachusetts, and has sufficient minimum contacts within the Commonwealth of Massachusetts as to render the exercise of jurisdiction permissible under traditional notions of due process.

27.    In addition, pursuant to FDEU's Bylaws, Defendants have selected this Court as the exclusive forum for resolution of claims against FDEU's trustees and officers "related to, arising out of or concerning [FDEU], its business or operations."

28.    Venue in this Court is proper under 28 U.S.C. § 1391(b).

## III.    SUBSTANTIVE ALLEGATIONS

### A.    Background

29.    FDEU was launched in 2015. Its stated strategy is "to achieve its investment objectives by investing at least 80% of its [assets] in a portfolio of equity securities of European companies of any market capitalization, including, but not limited to, common and preferred stock that pay dividends, depositary receipts and real estate investment trusts."

30.    FDEU is a closed-end fund, meaning that its shares were issued through an initial public offering ("IPO") in 2015 and now trade in the secondary market on a securities exchange.

31.    Unlike an open-end mutual fund, FDEU does not continuously issue and redeem shares at NAV; rather, investors may only buy and sell shares at the market price on the exchange.

When the trading price of a closed-end fund falls below the fund's NAV, it is called trading at a "discount."

32.     In connection with the Fund's IPO, to allay concerns that FDEU's shares might trade at a significant discount to NAV in the future, the prospectus promised shareholders that they could vote to convert FDEU to an open-end fund in 2023, allowing shares to be redeemed at NAV and effectively eliminating any discount.

33.     FDEU is overseen by the Trustee Defendants, who owe duties of care and loyalty to the Fund and its shareholders. Under FDEU's governing documents, the Trustee Defendants are not exculpated or indemnified for gross negligence or bad faith conduct.

34.     FDEU's investment adviser is First Trust, which established the Fund and is responsible for providing its operations directly or through outsourcing to other providers. First Trust operates approximately thirteen closed-end funds, including FDEU, all of which are overseen by the Trustee Defendants.

### B.     FDEU Performs Poorly And Trades At A Persistent Discount

35.     At the end of 2022, the Fund reported annualized returns based on the market value of its shares of 0.35% since inception—*i.e.*, less than inflation—versus the MSCI Europe Index's 4.98% annualized return during the same period. Long-term investors in the Fund lost significant purchasing power by investing in the Fund.

36.     Further, because the Fund's shares trade at a discount-to-NAV between 13% and 15%, investors must accept a fraction of the value of the Fund's underlying portfolio in order to exit their positions.

37.     Notwithstanding the above, the Trustee Defendants—who simultaneously oversee all of First Trust's funds and each receive more than $500,000 per year in connection with their

positions—have *renewed First Trust's management contract with the Fund every year* on the same terms with no repercussions for the Fund's performance or trading discount.

38.     First Trust has extracted over $27 million in management fees since the Fund's inception, devouring the majority of the Fund's investment returns and reflecting nearly 10% of the $330 million initially raised from investors in 2015.

39.     The Trustee Defendants own minimal, if any, shares in the Fund, and thus stand to benefit from their First Trust salaries exponentially more than through any improvements to the Fund's performance.

| Richard Erickson | Thomas Kadlec | Denise Keefe | Robert Keith | Niel Nielson |
|---|---|---|---|---|
| $0<br>(0 Shares) | $28,326.00<br>(2,159 Shares) | $19,680.00<br>(1,500 Shares) | $21,648.00<br>(1,650 Shares) | $39,360.00<br>(3,000 Shares) |

**C.     Bulldog Proposes To Nominate Two New Trustees,
Which Defendants Reject For Undisclosed Reasons**

40.     Bulldog, and the funds and accounts it manages, including Plaintiff, hold large investments in FDEU consisting, in the aggregate, of approximately 1.01 million shares representing approximately 5.91% of the Fund's voting shares, and thus have a significant interest in the Fund's improvement.

41.     Throughout 2022, Bulldog and First Trust discussed how the Fund could be improved and whether Defendants would support a proposal to convert FDEU to an open-end mutual fund. During the pendency of these discussions, Bulldog and First Trust agreed to a non-disclosure agreement that expired December 2, 2022 (the "NDA").

42.     The parties were not able to reach an agreement with respect to next steps for the Fund and, on December 3, 2022, Bulldog, on behalf of Special Opportunities Fund, Inc., sent a letter to First Trust and FDEU giving notice that it intended to nominate two individuals for

election to the Board at the upcoming annual shareholder meeting: Paul Poole and Jake Pampinella (the "Nominees").

43.     The nominations were undisputedly timely and contained with them all relevant informational requirements that Bulldog could derive from the Fund's Bylaws.

44.     The December 3, 2022 letter set forth each Nominee's date of birth, address, and citizenship. In addition, the letter stated that neither Nominee currently owned shares of the Fund or is or will be an interested person of the Fund; each Nominee appears to satisfy the qualifications of persons to be nominated or seated as trustees under the Fund's Bylaws, Article IV, Section 7; each Nominee meets all applicable legal requirements relevant to service as a trustee as set forth in Article III, Section 3 of the  Bylaws; and that all additional information sought by Article III, Section 3 of the Bylaws was not applicable to the Nominees.

45.     Notwithstanding that Bulldog provided all apparently applicable information, the December 3, 2022 letter stated "[p]lease advise us if you have any questions or whether any additional information is required."

46.     On December 14, 2022, First Trust responded by letter from its general counsel, Scott Jardine, purportedly on behalf of the Fund on FDEU letterhead.

47.     The December 14, 2022 letter stated that "[w]e are in receipt of your letter . . . regarding a purported nomination of two individuals to be submitted for election as trustees," but the Board "after due consideration, evaluation and consultation with legal counsel has determined that the Purported Notice is materially deficient and does not meet numerous of the requirements set forth in the by-laws of the Fund . . . including without limitation, the failure to provide all information regarding the Purported Nominees that would be required by various rules and forms under the federal securities laws to be provided in a proxy statement."

48.    Without identifying any specific missing information, First Trust stated that the information was purportedly "necessary for the Board [*i.e.*, the incumbents] to make an evaluation of the eligibility . . . and qualifications of a proposed nominee and to comply with the federal securities laws. Therefore, under the authority granted to the Board pursuant to the By-Laws, the Board has determined that the Purported Notice did not comply with the mandatory requirements of the By-Laws. As a result, such nominations will be disregarded and both Purported Nominees are deemed ineligible to be elected at the 2023 Meeting, and any votes submitted for a Purported Nominee at the 2023 Meeting shall not be counted."

49.    On December 18, 2023, Bulldog responded by letter stating that First Trust had failed to "enumerate specifically what information we failed to provide," and that "if the Trustees wish to act in good faith and not merely to prevent a contested election, they should tell us what specific information they would like us to provide to cure any purported deficiencies."

50.    Bulldog noted that First Trust had requested that Bulldog not submit nominations until *after* the NDA expired and the discussions between the parties ended. That left Bulldog with only two days before the nomination deadline of December 3, 2022 to submit the Nominees, but Bulldog offered to supplement the nominations with any material information that the Board believed was missing.

51.    Bulldog also offered to submit the purported nominee "questionnaire" referenced in the Fund's intentionally verbose and nonsensical Bylaws (if one existed), and stated that it would "file our preliminary proxy materials with the SEC which the staff can review for compliance with the 'various rules and forms under the federal securities laws.'"

52.    On December 21, 2022, First Trust responded by letter stating that the "Board hereby reiterates that after due consideration, evaluation and consultation with legal counsel, the

Board determined that the submission of the Purported Nominees was materially deficient and that under the authority granted to it under the By-Laws, the Board determined that the Purported Nominees are deemed ineligible to be elected at the 2023 Meeting, and that any votes submitted for a Purported Nominee at the 2023 Meeting shall not be counted." Again, neither First Trust nor the Board identified specific missing information.

53.     On February 6, 2023, Bulldog filed a preliminary proxy statement with the Securities and Exchange Commission ("SEC") stating that it would solicit shareholder proxies for the Fund's upcoming annual meeting in April 2023 and disclosing the Nominees.

54.     The SEC reviewed Bulldog's filings in connection with the Nominees and made no finding that any further information was required to be disclosed under the federal securities laws.

55.     Bulldog's preliminary proxy statement advised investors that, in connection with the Fund's initial offering in 2015, the Fund had agreed to consider in 2023 "whether it should convert to an open-end fund," which was a "selling point to investors in the IPO because it assured them that if a sizeable discount from NAV were to develop, there would eventually be an opportunity to eliminate it."

56.     Bulldog stated that "[w]ith the Fund's shares recently trading at a persistent double-digit discount to NAV, [it] reached out to the Board of Trustees to ask if the Board would recommend a vote for the conversion to an open-end fund. The Board refused to make any commitment at all. Consequently, [Bulldog is] soliciting proxies to elect Trustees who we believe will support action to address the persistent trading discount of the Fund's shares to their NAV."

**D.      The Conflicted Board Takes Action To Exclude Plaintiffs' Nominees**

57.     On February 10, 2023, Defendants caused FDEU to file a preliminary proxy statement, which asked shareholders to reelect Defendants Keefe and Keith as trustees.

58.     As to the Nominees, the Defendants stated that the Fund had purportedly "informed [Bulldog] that [its] Notice was materially deficient and that, as a result, nominations of the Bulldog Purported Nominees will be disregarded and both Bulldog Purported Nominees are deemed ineligible to be elected at the Meeting, and any votes submitted for a Bulldog Purported Nominee at the Meeting will not be counted."

59.     Defendants further stated that "[s]hareholders may receive solicitation materials from [Bulldog], including a proxy statement and a proxy card that will be a color other than white, and are urged to disregard any such materials received. Shareholders should NOT send back any other color proxy card as this will cancel out any votes previously submitted for the Board Nominees on the Fund's white proxy card. . . . [T]he Bulldog Purported Nominees are *ineligible* to be elected at the Meeting, and any votes submitted for a Bulldog Purported Nominee at the Meeting will *not* be counted."

60.     Again, neither First Trust nor the Trustee Defendants identified particular information in its proxy statement that Bulldog failed or refused to provide with respect to the Nominees, much less explain why any such information precluded the Nominees from receiving shareholders' votes.

61.     At the time, the Fund's Board consisted of Defendants Bowen, Erickson, Kadlec, Keefe, Keith, and Nielson. Because *three of its six members* were financially interested in excluding Plaintiffs' Nominees, the Board did not consist of a majority of independent trustees.

62.     Defendant Bowen is an interested member of the Board because of his position as CEO of First Trust. He has an undisputed financial interest in maintaining First Trust's management contract with FDEU.

63.     Defendants Keefe and Keith were likewise self-interested with respect to the Nominees because each was a competing candidate for the open positions. Both had financial and reputational self-interest in winning reelection, including retention of their salaries of $504,158 and $514,231, respectively.

64.     Nonetheless, the three interested trustees were permitted to participate in the Board's consideration of the Nominees—despite their obvious conflicts of interest—and the conflicted Board purportedly determined that the Nominees were "ineligible."

65.     The Trustee Defendants repeatedly represented to investors that no votes would be counted in favor of the Nominees without disclosing factual basis for excluding the Nominees or the conflicting interests of half of the members of the Board.

### E.     Bulldog Learns Of The Trustee Defendants' Use Of Illegal Control Share Measures In The Interim

66.     While Plaintiffs were soliciting shareholder votes in favor of the Nominees, they learned that the Trustee Defendants planned to utilize an illegal defensive mechanism in the Fund's Bylaws as an additional measure to shore up their positions in the election, even though such measures had been ruled to be illegal under the 1940 Act.

67.     Article XII of the Fund's Bylaws purports to eliminate the voting rights of so-called "control shares" unless specifically "authorized by vote of Shareholders at a meeting of Shareholders" through the "affirmative vote of the holders of a majority of all of the Shares entitled to vote generally in the election of Trustees" (the "Control Share Bylaw").

68.     Control shares are defined to include certain shares held by investors with voting power in excess of certain thresholds, beginning at 10% of voting power. The Control Share Bylaw states that absent authorization by a majority of shareholders, as described above, any shares

acquired by such an investor in excess of such threshold "shall not be 'entitled to vote' on any matters."

69.     The purpose of this limitation was to tilt elections in favor of the incumbents and against potential challengers, like the Nominees. Multiple courts have held that control share mechanisms, like the Control Share Bylaw, violate Section 18(i) of the ICA, which requires that every share of stock issued by a registered investment company "be a voting stock and have equal voting rights with every other outstanding voting stock."

70.     First, in *Eaton Vance Senior Income Trust v. Saba Cap. Master Fund, Ltd*., No. 2084CV01533BLS2, 2021 WL 2785120 (Mass. Super. Ct. Apr. 7, 2021), the Massachusetts Superior Court held, at the pleading stage, that a control share bylaw materially identical to the one at issue in this case violated Section 18(i) because it expressly restricted voting rights absent special approval.

71.     In a subsequent ruling on summary judgment, the court confirmed that ruling, finding that "Section 18 (i) is unambiguous" and its "plain language" requires that "all common shares of stock must be 'voting' and have voting rights that are 'equal' to the voting rights of all other shares"—*i.e.*, "every share of common stock must have the right to vote and must have voting power that is equivalent to that of all other stock." *Eaton Vance Sr. Income Trust v. Saba Capital Master Fund, Ltd*., No. 2084CV01533-BLS2, 2023 WL 1872102 (Mass. Super. Ct. Jan. 21, 2023).

72.     The court stated that the control share bylaw "violates this unambiguous requirement" because it "conditions the voting of certain shares on the consent of the majority of shareholders" and "imposes conditions on voting rights on shareholders that do not exist for others," creating a circumstance in which "different shares are subject to different voting rights, which [Section 18(i)] does not permit." The court entered judgment declaring the bylaw invalid.

73.     Second, in *Saba Cap. CEF Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, No. 21-CV-00327, 2022 WL 493554 (S.D.N.Y. Feb. 17, 2022), the U.S. District Court for the Southern District of New York held that Section 18(i) "requires that every share of stock issued by a registered management company . . . 'be a voting stock and have equal voting rights with every other outstanding voting stock,'" and that the bylaw at issue violated Section 18(i) because "whether a control shareholder's newly acquired stock entitles her to vote is contingent on an uncertain future event—whether the holders of the majority of stock, excluding stock owned by control shareholders, authorize it." The court further held that the bylaw violates Section 18(i)'s requirement that every share of stock "have equal voting rights with every other outstanding voting stock." The court entered judgment rescinding the bylaw.

74.     Following the unambiguous holdings in *Eaton Vance* and *Nuveen*, the Trustee Defendants had no legal basis whatsoever to enforce the Fund's Control Share Bylaw.

75.     Nevertheless, approximately two weeks before the Fund's annual meeting, Bulldog learned from a large shareholder that First Trust and the Trustee Defendants had taken steps to enforce the Control Share Bylaw in the upcoming election by refusing to count any votes above the share ownership threshold set forth therein.

76.     On February 6, 2023, in a letter from counsel, Plaintiff PCF demanded that the Trustee Defendants "rescind the Control Share Bylaw and amend and restate FDEU's bylaws to remove Article XII in its entirety."

77.     Defendants did not formally respond, but confirmed their intention to enforce the Control Share Bylaw in FDEU's February 10, 2023 preliminary proxy statement, which stated that "shareholders of record on the Record Date are entitled to one vote for each full Share the shareholder owns" except for control shares, which would be allowed "voting rights with respect

to such Shares only to the extent the authorization of such voting rights is approved by other shareholders of the Fund."

78.     On March 15, 2023, Plaintiff PCF sent a second letter to the Trustee Defendants, again through counsel, stating that "[m]ore than one month has passed since our letter and we have neither heard from the Board nor seen public filings to suggest that the Control Share Bylaw has been rescinded. . . . Please advise us immediately as to the Board's position with respect to our February 6, 2023 demand and its intentions, if any, to enforce the Control Share Bylaw in the interim." Defendants still did not formally respond.

**F.     Defendants Continue To Refuse To Address The Merits Of The Fund's Performance Despite The Likelihood That They Would Lose The Election**

79.     On February 28, 2023, FDEU filed its definitive proxy statement, which announced that the Fund would hold its Annual Meeting of Shareholders on April 3, 2023 (the "Meeting").

80.     Defendants continued to refuse to campaign and claimed only that the Nominees were "*ineligible* to be elected at the Meeting and that any votes submitted for either of them at the Meeting will *not* be counted."

81.     Defendants made no other efforts to persuade shareholders to vote for Defendants Keefe or Keith other than by stating superficially that the "Board unanimously recommends that you vote FOR the Board Nominees." Again, however, Defendants did not address the Board's conflicts of interest with respect to the election.

82.     Defendants also made no efforts to explain to voters why Bulldog's Nominees were unsuitable or less preferable than Defendants' incumbent nominees other than by stating superficially that the Nominees were "ineligible."

83.     On March 3, 2023, Bulldog filed a definitive proxy statement soliciting votes in favor of the Nominees. The definitive proxy statement outlined a number of reasons why shareholders should vote in favor of the Nominees, and against the incumbents, including:

- "Each of the so-called independent Trustees of FDEU makes over $500,000 per year from mutual funds managed by First Trust. We think that level of compensation has compromised their independence."

- "Investors who originally purchased shares of FDEU were promised that, in 2023, the Trustees would call a shareholder meeting to vote to convert it to an open-end fund. Because the Fund's shares have been trading at a double-digit discount to their net asset value (NAV), we recently reached out to the Board of Trustees to ask if they intended to recommend a vote for the Fund's conversion to an open-end fund. They refused to commit and gave no reason."

- "We think the reason is that if FDEU open-ends, some shareholders may redeem their shares at NAV. That would reduce the size of the Fund and the fees that First Trust earns from managing it. In other words, what is good for shareholders may be bad for management. And the Trustees want to keep management's fees up so as not to jeopardize their own massive fees."

- "Because the Trustees refused to commit to do the right thing for shareholders, we decided to solicit proxies to elect truly independent Trustees who we are confident will support an open-ending or other action to address the trading discount of the Fund's shares."

- "[The Trustees] claim that our nominees are 'ineligible' and say they will refuse to count any votes submitted for them. That is a transparent and, we believe, illegal attempt to entrench themselves in their positions as Trustees."

- "[T]he Trustees have nevertheless committed to spend more than $170,000 of shareholder – not their own -- money to solicit proxies [for the incumbents]."

- "If you want a higher stock price for your shares of FDEU, our advice is to ignore the Trustees' self-serving phone calls and letters and vote for our nominees on the enclosed Green proxy card."

84.     Defendants did not substantively respond and continued to rely on their insistence that the election would be an uncontested one regardless of the wishes of shareholders.

85.     Defendants spent three times as much of the Fund's assets on filings and materials relating to the proxy contest, despite refusing to substantively campaign, compared to years past.

**G.      Defendants Announce A Conversion To An Open-End
ETF In An Effort To Stave Off Plaintiffs' Nominees**

86.      As the April 3, 2023 Meeting approached, Defendants appear to have realized the

near certainty of losing the election. In response, Defendants attempted to pivot by announcing a

proposal to convert the Fund to an open-end structure *as if it were somehow the Board's idea and

not the result of Bulldog's campaign.*

87.      On March 22, 2023—less than two weeks before the Meeting—Defendants

announced that the Board had approved a "reorganization of FDEU into a to-be-created exchange-

traded fund ('ETF'), that will be traded on the NYSE Arca and will be an actively managed ETF

managed by [First Trust] and sub-advised by Janus Henderson Investors, FDEU's current sub-

advisor."

88.      The details on the purported reorganization were sparse and did not include any

timeline other than "during 2023, subject to requisite shareholder approval of FDEU and

satisfaction of applicable regulatory requirements and approvals and customary closing

conditions."

89.      Moreover, the Board stated that "there is no assurance when or whether such

approvals, or any other approvals required for the transaction, will be obtained."

90.      Because Plaintiffs did not trust the conflicted Board to act in the Fund's best

interests, whether with respect to a reorganization or otherwise, they continued to solicit investor

proxies for votes in favor of the Nominees.

**H.      Plaintiffs Refuse To Participate In The Sham
Election But Garnered Far More Votes Than Defendants**

91.      On April 3, 2023, the Fund held the Meeting to vote on trustees. Because of

Defendants' statements prior thereto—*i.e.*, that no votes in favor of the Nominees would be

counted—Plaintiffs did not attend. Instead, Plaintiffs boycotted the Meeting and prepared to file this action.

92.     Because Plaintiffs did not attend and submit votes in favor of the Nominees, it appears that the Fund did not obtain a quorum, which requires the participation of at least one third of outstanding shares.

93.     According to Broadridge, a third-party proxy service that tallied the votes for the candidates, shareholders voted in favor of the Nominees by a significant margin even without counting the shares illegally excluded under the Control Share Bylaw, as shown below:

| Votes For The Incumbent Trustees | Votes For The Nominees |
|---|---|
| Denise M Keefe<br><br>Excluding control shares: 3,286,606 | Paul Poole<br><br>Excluding control shares: 3,414,768 |
| Robert F. Keith<br><br>Excluding control shares: 3,295,997 | Jake Pampinella<br><br>Excluding control shares: 3,413,850 |

94.     Moreover, the numbers above understate the Nominees' expected margin of victory because they do not include another 842,932 shares held by Plaintiffs that would also have been voted in favor of the Nominees.

95.     Based on Bulldog's conservative estimate accounting for shares not included in the Broadridge totals above, the Nominees would have won the election by a margin of 54% to 46%, even excluding shares under the Control Share Bylaw.

96.     If all votes were counted—*i.e.*, including votes that were excluded under the Control Share Bylaw—the Nominees would have won by a margin of 62% to 38%.

97.     Defendants have yet to release the final vote tally or admit that the Meeting failed to achieve a quorum. Nonetheless, shareholders spoke decisively and would have elected the Nominees but for Defendants' vote-rigging.

98.     Defendants had no legitimate business rationale for excluding the Nominees or votes under the Control Share Bylaw other than to protect their own financial interests in their positions and control over the Fund. To the extent that Defendants contend (erroneously) that any measures they took were in the Fund's best interests, they have blatantly contradicted the will of shareholders and elevated their own subjective views and financial interests above those of their constituency.

## CAUSES OF ACTION

## COUNT I

## (Declaratory Judgment)

99.     Plaintiffs repeat and reallege each of the allegations set forth in the paragraphs above as if fully set forth herein.

100.     An actual and justiciable controversy exists between Plaintiffs and Defendants with respect to the validity of Plaintiffs' Nominees and the enforcement of the Control Share Bylaw. Under 28 U.S.C. §2201 and Fed. R. Civ. P. 57, this Court has the power to declare the rights and other legal relations of the parties, which shall have the force and effect of a final judgment.

101.     A declaration is necessary and appropriate at this time under the circumstances alleged herein in order that the parties may ascertain their respective rights and duties.

102.     Plaintiffs properly nominated the Nominees in advance of the Meeting, but Defendants improperly stated that they would exclude all votes in favor of the Nominees. Defendants have no good faith basis for the exclusion of the Nominees.

103.    In addition, the Control Share Bylaw violates Section 18 (i) of the ICA and is void and unenforceable, but Defendants stated that they will enforce the Control Share Bylaw to exclude votes in connection with the Meeting. Defendants have no good faith basis to utilize the illegal Control Share Bylaw in connection with the Meeting.

104.    Plaintiffs are entitled to a declaration from this Court that (i) the Nominees were improperly rejected; and (ii) the Control Share Bylaw is void and unenforceable under the ICA.

## COUNT II

### (Rescission Under The ICA)

105.    Plaintiffs repeat and reallege each of the allegations set forth in the paragraphs above as if fully set forth herein.

106.    The Control Share Bylaw violates Section 18 (i) of the ICA, which states that "every share of stock . . . issued by a registered management company . . . shall be a voting stock and have equal voting rights with every other outstanding voting stock." 15 U.S.C. § 80a-18(i).

107.    Section 46(b) of the ICA provides a private right of action for rescission for any "contract that is made, or whose performance involves, a violation of [the ICA], or of any rule, regulation, or order thereunder."

108.    The Control Share Bylaw constitutes an illegal contract between the Fund and its shareholders, including Plaintiffs, and is unenforceable and subject to rescission.

109.    Plaintiffs seek rescission of the Control Share Bylaw.

110.    Absent relief from the Court, Plaintiffs and all shareholders will be irreparably harmed and Plaintiffs have no adequate remedy at law.

## COUNT III

### (Breach of Fiduciary Duties)

111.    Plaintiffs repeat and reallege each of the allegations set forth in the paragraphs above as if fully set forth herein.

112.    The Trustee Defendants owe to Plaintiffs fiduciary duties of care and loyalty.

113.    The Trustee Defendants breached those duties by rejecting, in bad faith, the Nominees for the purpose of entrenching themselves and First Trust in office and thwarting shareholders' franchise rights.

114.    The Trustee Defendants also breached their duties by enforcing, in bad faith, the Control Share Bylaw despite that multiple courts have deemed such defensive mechanisms to violate the ICA.

115.    The Trustee Defendants have personal financial interests in the reelection of the incumbents, Defendants Keefe and Keith, and acted on those interests to block the election of the Nominees. The Trustee Defendants had no legitimate business purpose for excluding the Nominees other than to advance their own personal financial interests in their positions and salaries.

116.    As a result of the Trustee Defendants' conduct, Plaintiffs have incurred damages in an amount to be proven at trial as well as the costs and expenses incurred in connection with this action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Declaring that the Defendants improperly rejected the Nominees;

B.    Declaring that the Control Share Bylaw is void and unenforceable and is rescinded pursuant to § 46(b) of the ICA;

C.      Declaring that Defendants breached their fiduciary duties by rejecting votes in favor of the Nominees and by rejecting control share votes pursuant to the Control Share Bylaw;

D.      Awarding Plaintiffs damages as may be proven at trial;

E.      Awarding Plaintiffs the costs of this action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

F.      Granting such further relief as the Court deems just and proper.

Dated: May 10, 2023                     Respectfully submitted,


                                        */s/ Jason M. Leviton*
                                        Jason M. Leviton (#678331)
                                        Joel A. Fleming (#685285)
                                        Brendan T. Jarboe (#691414)
                                        BLOCK & LEVITON LLP
                                        260 Franklin Street, Suite 1860
                                        Boston, MA 02110
                                        jason@blockleviton.com
                                        joel@blockleviton.com
                                        brendan@blockleviton.com

                                        Aaron T. Morris (#685076)
                                        Andrew W. Robertson (pro hac forthcoming)
                                        MORRIS KANDINOV LLP
                                        1740 Broadway, 15th Floor
                                        New York, NY 10019
                                        aaron@moka.law
                                        andrew@moka.law